**Slip Op. 03-121**

**United States Court of International Trade**

<table>
<tr><td>

USEC INC. and UNITED STATES
ENRICHMENT CORPORATION,

              Plaintiffs,

      v.

UNITED STATES,

              Defendant.

</td><td>

Before:   Pogue, Wallach, and
           Eaton, Judges

Court No. 02-00112; and Court
Nos. 02-00113, 02-00114 and
Consol. Court Nos. 02-00219; 02-
00221, 02-00227, 02-00229, and
02-00233

</td></tr>
</table>

[Commerce's remand determination reversed in part and affirmed in part.]

                     Decided: September 16, 2003

Fried, Frank, Harris, Shriver & Jacobson (David E. Birenbaum, Jay R. Kraemer, Mark Fajfar) for Plaintiffs and Defendant-Intervenors Urenco Limited, Urenco Deutschland GmbH, Urenco Nederland B.V., Urenco (Capenhurst) Ltd., and Urenco, Inc.; Weil, Gotshal & Manges, LLP (Stuart M. Rosen, Gregory Husisian, Jennifer J. Rhodes) for Plaintiffs and Defendant-Intervenors Eurodif S.A., COGEMA, and COGEMA, Inc.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, David R. Mason, Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant United States.

Steptoe & Johnson LLP (Sheldon E. Hochberg, Richard O. Cunningham, Eric C. Emerson) for Defendant-Intervenors and Plaintiffs USEC Inc. and United States Enrichment Corporation.

Shaw Pittman LLP (Stephan E. Becker, Nancy A. Fischer, Sanjay J. Mullick, Joshua D. Fitzhugh) for Plaintiff-Intervenors Ad Hoc Utilities Group.

**OPINION**

**Pogue, Judge:** In <u>USEC Inc. v. United States</u>, 27 CIT __, 259 F. Supp. 2d 1310 (2003) ("<u>USEC I</u>"),[1] this Court remanded aspects of the final affirmative antidumping and countervailing duty determinations of the Department of Commerce ("the Department" or "Commerce") with regard to low enriched uranium ("low enriched uranium" or "LEU") from France, Germany, the Netherlands, and the United Kingdom.[2] The Court instructed Commerce to evaluate the applicability of its tolling regulation, 19 C.F.R. § 351.401(h), to determine whether the intervenors (the "utilities," also the "Ad Hoc Utilities Group" or "AHUG") should be designated as producers of LEU. <u>USEC I</u>, 27 CIT at __, 259 F. Supp. 2d at 1326. The Court

---

[1] Familiarity with the Court's prior opinion is presumed.

[2] The determinations challenged in the original action were <u>Low Enriched Uranium from France</u>, 67 Fed. Reg. 6,680 (Dep't Commerce Feb. 13, 2002) (notice of amended final determination of sales at less than fair value and antidumping duty order); <u>Low Enriched Uranium from France</u>, 66 Fed. Reg. 65,877 (Dep't Commerce Dec. 21, 2001) (notice of final determination of sales at less than fair value) ("<u>LEU from France</u>"); <u>Low Enriched Uranium from France</u>, 67 Fed. Reg. 6689 (Dep't Commerce Feb. 13, 2002) (notice of amended final determination and notice of countervailing duty order); <u>Low Enriched Uranium from France</u>, 66 Fed. Reg. 65,901 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determination); <u>Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom</u>, 67 Fed. Reg. 6,688 (Dep't Commerce Feb. 13, 2002) (notice of amended final determinations and notice of countervailing duty orders); <u>Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom</u>, 66 Fed. Reg. 65,903 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determinations).

further directed that if Commerce found the tolling regulation applicable, the agency should also (1) reconsider whether application of the regulation affects the determination as to which companies are "producers" for the purpose of the industry support determination, USEC I, 27 CIT at __, 259 F. Supp. 2d at 1328; and (2) reconsider its application of the countervailing duty laws. USEC I, 27 CIT at __, 259 F. Supp. 2d at 1329. The Court now reviews the results of the remand as presented in Commerce's Final Remand Determination, USEC Inc. and United States Enrichment Corporation v. United States (June 23, 2003)("Remand Determ."). Jurisdiction lies under 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2000).

## Background

The antidumping and countervailing duty investigations at issue here covered all low enriched uranium. Low enriched uranium is used to produce nuclear fuel rods, which in turn produce electricity in nuclear reactors. See, e.g., USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314. Uranium enrichment is one of five steps in the production of nuclear fuel.[3] See id.; LEU from France, 66

---

[3] The steps involved in nuclear fuel production are: (1) mining uranium ore; (2) milling and/or refining the ore into uranium concentrate, referred to as natural uranium ($U_{308}$); (3) converting the natural uranium into uranium hexafluoride ($UF_6$), or "feed uranium;" (4) enriching uranium hexafluoride to create low enriched uranium; and (5) using the low enriched uranium to fabricate nuclear fuel rods for use in nuclear reactors. USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314; see also LEU from France, 66 Fed. Reg. at 65,879.

Fed. Reg. at 65,879. At issue in this proceeding is whether, for purposes of application of the antidumping and countervailing duty statutes, the "separative work unit" contracts entered into by the utilities and the companies that enrich the uranium feedstock (the "enrichers") constitute subcontracting arrangements involving the purchase of services or sales of enriched uranium.

As we more fully explained in USEC I, nuclear utilities employ two types of contracts for procuring LEU from uranium enrichers. See, e.g., USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314. One is a contract for enriched uranium product ("EUP contract"), in which the utility simply purchases LEU from the enricher. See LEU from France, 66 Fed. Reg. at 65,878, 65,884. In an EUP contract, the price paid for the LEU covers all elements of the LEU's value, including the feed uranium and the effort expended to enrich it. Transcript of Dep't of Commerce Hearing in the Matter of Low Enriched Uranium from France, Germany, the Netherlands, and the United Kingdom (Oct. 31, 2001), Jt. App. Tab 6-A at 46 ("Hrg. Trans."). As noted in USEC I, all parties to this action agree that sales of enriched uranium product constitute sales of merchandise subject to the antidumping and countervailing duty laws. USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314.

The second type of contract is called a "separative work unit" or "SWU" contract. A "separative work unit" is a measurement of the amount of energy or effort required to separate a given

quantity of feed uranium into LEU and depleted uranium, or uranium "tails," at specified assays. See LEU from France, 66 Fed. Reg. at 65,884. Under a SWU contract, a utility purchases separative work units and delivers a quantity of feed uranium to the enricher. LEU from France, 66 Fed. Reg. at 65,878, 65,884-85.

As discussed in USEC I, because feed uranium is fungible, the specific feed uranium provided by a utility need not be used to produce LEU for that utility. See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1315 (citing Resp. Br. of USEC, Inc. Opp'n Cogema/Urenco Mot. J. Agency R. at 16-17 & n.21). Enrichers maintain inventories of feed uranium, which is not segregated according to source or ownership, and any uranium held by the enricher may be used to produce LEU for any customer. Id.

Utilities purchase feed uranium from third parties,[4] and prior to delivering the feed uranium to the enricher, the utilities have title, risk of loss, power to alienate or sell, and use and possession of the feed uranium. The utility retains title to feed uranium supplied to the enricher until the enricher delivers the LEU ordered by the utility. In addition, at the time of delivery of the LEU, the enricher recognizes that title to the LEU is also held by the utility. As stated in one of the contracts in the record, "[t]itle to the Feed Material shall remain with [the

---

[4] Nothing in the record suggests that the parties from whom utilities purchase the feed uranium are in any manner related to the enrichers.

utility] until the [LEU] Delivery associated with such Feed

Material . . . at which time the Feed Material shall be deemed to

have been enriched; whereupon [the utility] sha[ll] have title to

such [LEU] associated with such Feed Material and title to such

Feed Material will be extinguished." Uranium Enrichment Services

Contract between [Utility A] and Urenco, Jt. App. Tab 3-F at JA-

1364; see also Uranium Toll Enrichment Services Contract between

[Utility B] and COGEMA, Inc., Jt. App. Tab 3-A at JA-1210; Uranium

Enrichment Services Contract between [Utility C] and COGEMA, Inc.,

Jt. App. Tab 3-E at JA-1302; Uranium Enrichment Services Contract

between [Utility D] and Urenco, Jt. App. Tab 3-G at JA-1399. In

USEC I, we described the SWU transactions as follows:

> Pursuant to the SWU contracts, risk of loss or damage to
> the feed uranium, as well as use and possession, pass
> from the utility to the enricher upon delivery of the
> feed uranium to the enricher. However, the enricher does
> not obtain title to the feedstock; rather, actual title
> is at all times with the utility. Nor does the enricher
> have the power to sell a utility's feedstock to a third
> party. Moreover, it appears clear on this record that at
> the moment when the LEU is delivered to the utility by
> the enricher, the utility has title to and ownership of
> the LEU. The feed uranium does not become an asset of
> the enricher, nor is it ever reflected as such on the
> enricher's books and records.[5]

USEC I, 27 CIT at __, 259 F. Supp. 2d at 1315 (internal citations

---

[5] See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1315-16 n.5
(noting that (1) the foreign enrichers' records, which were
verified by Commerce, did not reflect payments for customer-
provided uranium, (2) USEC requires utilities to pay the property
taxes on customer-provided uranium in USEC's possession, and (3)
the record does not indicate that the enrichers treated customer-
provided uranium as an asset).

omitted).

In reaching its original affirmative antidumping and countervailing duty determinations, Commerce found that under both LEU and SWU contracts the enrichers were producers of LEU for purposes of the less-than-fair-value determination.[6]  The agency concluded that EUP and SWU contracts were "functionally equivalent," in that "the overall arrangement under both types of contracts is, in effect, an arrangement for the purchase and sale of LEU."  LEU from France, 66 Fed. Reg. at 65,884-85.

In USEC I, this Court concluded that the circumstances of the SWU transactions at issue resemble those of earlier cases involving "tolling" or "subcontracting" arrangements in which Commerce applied its tolling regulation, 19 C.F.R. § 351.401(h), to determine that the tollee, rather than the toll manufacturer, or subcontractor, was the producer of the subject merchandise.  The Court therefore directed Commerce to assess the applicability of the tolling regulation, and thus, the propriety of designating the

---

[6] To determine whether merchandise is being sold or is likely to be sold in the United States at less than fair value, Commerce compares the merchandise's normal value, or the price at which the merchandise is first sold for consumption in the exporting country, to the export price or constructed export price, which represents the price of the good when sold in or for export to the United States.  See 19 U.S.C. § 1673; 19 U.S.C. § 1677a; 19 U.S.C. § 1677b(a).  In making an export price or constructed export price determination, Commerce first must decide which company is the producer or exporter of the merchandise.  See 19 U.S.C. § 1677a(a)-(b); Taiwan Semiconductor Mfg. Co. v. United States, 25 CIT __, __, 143 F. Supp. 2d 958, 966 (2001).

enrichers as producers of LEU and respondents in the antidumping and countervailing duty investigations. See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1326, 1331. The Court also directed Commerce to explain why it applied a different definition of the term "producer" in the context of determining industry support than that used in the context of calculating the dumping margin. USEC I, 27 CIT at __, 259 F. Supp. 2d at 1328.

In its Remand Determination, Commerce concludes once again that the enrichers, rather than the utilities, are the producers of LEU, finding that (1) "the enrichers make the only relevant sales that can be used for purposes of establishing U.S. price and normal value," (2) the enrichers "are the only companies engaged in the production of LEU," (3) the enrichers "control the production of LEU," and (4) the utilities are "industrial users and consumers of LEU." Remand Determ. at 52. Commerce also explained that the different definitions of the term "producer" are warranted by the purposes underlying the relevant statutory provisions. Id. at 14-15, 22-23, 25.

## Standard of Review

This Court will uphold an agency determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**Discussion**

## I.  Ownership of the Subject Merchandise

Commerce bases its selection of the enrichers as the producers of LEU primarily on its conclusion that under the terms of the contracts, the enrichers own all of the LEU that they have produced but not yet delivered.  See Remand Determ. at 52, 59.  Commerce asserts that the enrichers transfer title to and ownership of the LEU to the utilities upon delivery of the LEU.  Id.  Therefore, Commerce argues, the delivery of the LEU effects a transfer of title and ownership for consideration, which constitutes a sale under NSK Ltd. v. United States, 115 F.3d 965, 973 (Fed. Cir. 1997), and a relevant sale for the purposes of calculating a dumping margin.  Id. at 59-60.

As we discussed in USEC I, however, the SWU contracts governing the transactions at issue establish a legal fiction that the very feed uranium delivered by a utility to an enricher is enriched and then returned as LEU to the utility.  See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1321-22; Oral Arg. Trans. at 33-34, 38, 41.  The Court concluded that although the enrichers obtain the right to use and possess the feedstock, and assume the risk of loss or damage, there is no evidence that they ever obtain ownership of either the feed uranium or the final enriched product.  USEC I, 27 CIT at __, 259 F. Supp. 2d at 1315, 1323; see also Oral Arg. Trans. at 30-35, 38, 41.  Moreover, the contractual provisions addressing

the retention of title in the feed uranium and passage of title in the LEU suggest an intention to establish a continuous chain of ownership in the utility while maintaining the enricher's ability to cover its obligations under the contract should it encounter difficulties in producing or providing LEU for a customer.  See, e.g, Oral Arg. Trans. at 33-34 (noting that the contractual provisions specifying that a utility obtains title to LEU are necessary because "if title to the product material were not specified clearly in the contract, there could be a question"), 38 ("[The enricher] receives material that it is holding for the account of the Utility customer, to be enriched and returned.  And, when it is returned in enriched form, title passes to the enriched product.  Title is extinguished in the feed."); Uranium Enrichment Services Contract between Cogema, Inc. and [Utility E], App. to Response of USEC to Dep't of Commerce's Remand Determ. of June 23, 2003, Tab 1 at JA-9003 ("USEC Remand App."); Uranium Enrichment Services Contract between [a utility] and Urenco, USEC Remand App. Tab 2 at JA-9074; see also contracts cited supra pp. 5-6.  For example, these provisions enable the utility to claim the amount of feed uranium delivered, or the value thereof, from the enricher in the event that the enricher breached the contract.  Such a contractual arrangement, which is apparently beneficial to both parties, is aided by the essential fungibility of the material at issue.  Parsing the contractual provisions at issue does not lead

to the conclusion that the enricher obtains ownership over the LEU and then sells it to the utility. Rather, the contracts delineate a transaction in which a utility provides raw material to an enricher, pays for the service of processing the material, and obtains the finished product after the manufacturing service has been performed.

Because the enricher does not obtain ownership of the LEU enriched under SWU contracts, the transfer of LEU by the enricher to the utility cannot constitute a sale of merchandise under NSK Ltd. v. United States. See 115 F.3d at 975 (concluding that a sale "requires both a transfer of ownership to an unrelated party and consideration"). Nothing in Commerce's Remand Determination provides any evidentiary or legal basis for a contrary conclusion. Commerce's basic premise in the Remand Determination is that "the enrichers make the only relevant sales that can be used for purposes of establishing U.S. price and normal value." Remand Determ. at 52. This statement, however, begs the question whether these transactions can truly be construed as relevant sales of merchandise. Commerce's duty is to investigate "sales" at less than fair value. The agency's assertion that the enrichers' transactions with the utilities are the only transactions that could be such sales, without more, does not establish that there is an evidentiary or legal basis to conclude that those transactions constitute sales for purposes of our antidumping statutes.

Commerce's subsidiary factual determination is no more well-founded. Commerce asserts that because the utilities only hold title to the feedstock at the time prior to delivery, "[t]he enricher, by contrast, would have rights as to the LEU." Remand Determ. at 58. Commerce, however, cannot and does not provide any evidentiary basis for this supposition; nothing in the record supports a determination that the enricher has any ownership rights. Accordingly, Commerce's determination is unsupported by substantial evidence and not in accordance with law.

## II. Equivalence of EUP and SWU Contracts

In addition to its claim that the enrichers obtain ownership of the LEU, Commerce also bases its conclusions upon the assertion that EUP and SWU contracts are fundamentally equivalent. Commerce states that

> the completed product, LEU, is entering the marketplace through the transactions at issue. Utility customers cannot obtain LEU by purchasing enrichment alone. Rather, in every instance in which the utility customer enters into a SWU transaction, it is obtaining LEU.

Remand Determ. at 61.

Commerce made essentially the same argument in its original determinations when it stated that "the overall arrangement under both [EUP and SWU] contracts is, in effect, an arrangement for the purchase and sale of LEU." LEU from France, 66 Fed. Reg. at 65,884. This Court dismissed that argument in USEC I when we

stated that "under any tolling arrangement, the 'overall arrangement' is one for acquisition of a good, usually manufactured by the toller." USEC I, 27 CIT at __, 259 F. Supp. 2d at 1324. Furthermore, the SWU transaction does not account for the full value of the finished product; rather, it accounts only for the value of the enrichment processing. Cf. Response to Court Remand, Taiwan Semiconductor Mfg. Co. v. United States, Jt. App. Tab 7-A at JA-2604 (Dep't Commerce June 30, 2000) ("Under the Department's practice, the 'relevant sale' must be a sale by the company that owns the merchandise entirely, including all essential components, can dispose of the merchandise at its own discretion, and, thus, controls the pricing of the merchandise and not merely the pricing of certain portions of production. . . . In contrast, a subcontractor's or toller's price does not represent all elements of value. Rather, the subcontractor or toller merely performs one or more segments of the manufacturing process at the direction of another entity. Thus, subcontracted production is distinguishable from other types of production because the subcontractor does not bear at least one element of cost which is essential to production of the subject merchandise.") ("SRAMS Remand Response"). Here, the SWU transaction represents approximately 65 percent of the value of the LEU, and is not equivalent to a sale of the finished product at its full value. See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1325 (indicating that natural uranium supplies "approximately 35 percent

of enriched uranium's total value").

Commerce states in a footnote that "in a meaningful sense, enrichment transactions do reflect the full value of the LEU since the things of value provided by the utility customer to the enricher (cash and natural uranium) account for the full value of the LEU received by the customer from the enricher." Remand Determ. at 54 n.34. Yet this reasoning could be applied to any subcontracting case, including some of Commerce's earlier tolling cases, in which a tollee provides raw materials to the toll manufacturer and pays for the manufacturing services. For example, in SRAMS from Taiwan, the value of the wafer design and design mask provided by the design house plus the value of the manufacturing processes performed by the toller, considered together, reflect the full value of the finished product. In that case, however, Commerce recognized that the toller was paid only for the actual manufacturing processes, and that "a subcontractor's or toller's price does not represent all elements of value." SRAMS Remand Response, Jt. App. Tab 7-A at JA-2603-04. In Certain Pasta from Italy, Corex provided the materials to the toller and paid the toller for its manufacturing services. 63 Fed. Reg. 53,641, 53,642 (Dep't Commerce Oct. 6, 1998) (preliminary results of new shipper antidumping duty administrative review). The payment to the toller was characterized as a "processing fee," and Commerce determined that Corex, rather than the toller, was the producer of

the subject merchandise. Id. Commerce has stated that "[t]ypically, the subcontracting, or tolling, addressed by [the tolling regulation] involves a contractor who owns and provides to the subcontractor a material input and receives from the subcontractor a product that is identifiable as subject merchandise." SRAMS Remand Response, Jt. App. Tab 7-A at JA-2604. Consequently, we find unpersuasive Commerce's argument that the transaction between the tollee and toll manufacturer reflects the full value of the merchandise produced.[7]

---

[7] Commerce also cites to Polyvinyl Alcohol from Taiwan for the proposition that "the sale of subject merchandise may occur in two distinct transactions," and "such relevant sales may be combined to derive, and calculate, the price of the subject merchandise." Remand Determ. at 55-56 (citing Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. 32,810, 32,81[3-14] (Dep't Commerce June 16, 1998) (final results of antidumping duty administrative review)). The transactions in Polyvinyl Alcohol from Taiwan to which this comment refers are those between Perry and Chang Chun. Commerce determined that Chang Chun, the toller, was the producer of the subject merchandise and that the other company, Perry, was merely an importer and reseller. See Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. 6,526, 6,527 (Dep't Commerce Feb. 9, 1998) (preliminary results of antidumping duty administrative review). Perry had restructured its contractual arrangement with Chang Chun after Commerce found that Chang Chun was selling subject merchandise at less than fair value. See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1320-21 n.11 (citing Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 6,527). Under the restructured contract, Perry purchased inputs from an affiliate of Chang Chun and arranged delivery of the inputs to Chang Chun for processing. USEC I, 27 CIT at __, 259 F. Supp. 2d at 1321 n.11 (citing Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 6,527). As we stated in USEC I, "[t]he crucial finding in Polyvinyl Alcohol from Taiwan was that, under the circumstances, Perry had simply restructured its payments to Chang Chun in an effort to circumvent the antidumping duties." USEC I, 27 CIT at __, 259 F. Supp. 2d at 1321 n.11. By contrast, in considering DuPont's relationship with Chang Chun in the same case, Commerce held that

## III. The Tolling Regulation, 19 C.F.R. § 351.401(h)

In the Remand Determination, Commerce again concludes that the tolling regulation does not apply in this case to designate the utilities as producers of LEU for purposes of calculating export price or constructed export price.  See Remand Determ. at 47, 52. As in its original determinations, Commerce concludes that the enrichers are the producers of LEU.  Id. at 45, 52, 56-57.

In explaining its decision, Commerce reasons that the tolling regulation "does not purport to address all aspects of an analysis of tolling arrangements," and that the agency looks at the totality of the circumstances in making its determination.  Remand Determ. at 49 (quoting Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 32,813).  Commerce distinguishes the prior tolling cases cited by

---

DuPont was the producer of the subject merchandise because DuPont manufactured the primary input, shipped it to Taiwan for processing by Chang Chun according to specifications supplied by DuPont, and exported it from Taiwan back to the United States and to third countries.  See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1320 (citing Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 6,527).

The instant case is more similar to the contract between DuPont and Chang Chun than to the contract between Perry and Chang Chun.  First, in the course of managing the sequential steps in the production of nuclear fuel, the utility purchases uranium feedstock from a third party and pays the enricher to process it into LEU.  See, e.g., USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314-15.  Second, the utility does not merely import and resell LEU.  Finally, the contractual arrangement here long predates the initiation of unfair trade investigations.  See, e.g., Hrg. Trans., Jt. App. Tab 6-A at 43-45; Oral Arg. Trans. at 42. Unlike the contract referred to in the Remand Determination, the SWU contracts here are not simply restructured purchase contracts.

the Court in USEC I on the grounds that in each of those cases, the

agency "faced a choice of respondents, based upon its analysis of

the sales made by two entities - the toller on the one hand, and

the tollee on the other."  Remand Determ. at 48.  Commerce argues

that in each of the earlier cases,

> the tollee sold the subject merchandise, as contemplated
> by the regulation.  Second, in nearly all of these cases,
> and in particular where the Department was required to
> examine the totality of the circumstances to determine
> the producer, the tollee engaged in manufacturing or
> processing operations.  In no instance did the Department
> determine an entity was a producer based solely upon its
> purchase of an input and the designation of product
> specifications.

Remand Determ. at 62-63.  The agency says that in this case, by

contrast, the tollees did not sell the completed merchandise.  As

the utilities made no sales of the subject merchandise, Commerce

claims that they cannot be designated as respondents for the

purpose of establishing export price or constructed export price.

Therefore, Commerce concludes, "the tolling regulation cannot be

applied to the facts and circumstances of this case without

defeating the purpose of the regulation and the statutory

provisions that the regulation is designed to implement."  Remand

Determ. at 47.  Commerce asserts that the tolling regulation does

not contemplate the circumstances of this case, and that "the

statutory provisions governing the establishment of U.S. price are

silent" as to how to calculate U.S. price in such circumstances.

Id. at 51; see also id. at 47 ("A fundamental requirement upon

which the tolling regulation is premised is that merchandise produced through a tolling operation is sold to a party in the United States. . . . In promulgating the tolling regulation, the Department did not contemplate the situation in which the tollee makes no sales of subject merchandise."). Commerce thus proceeds to evaluate "the totality of the circumstances in order to select the appropriate respondents." Remand Determ. at 50.

It is certainly true that the tolling regulation does not "address all aspects of an analysis of tolling arrangements," Remand Determ. at 49 (quoting Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 32,813), and that the agency may look at the totality of the circumstances in making a determination. See, e.g., Stainless Steel Bar from India, 66 Fed. Reg. 13,496, 13,496 (Dep't Commerce Mar. 6, 2001) (preliminary results of new shipper antidumping duty administrative review) ("In determining whether a company that uses a subcontractor in a tolling arrangement is a producer pursuant to 19 C.F.R. [§] 351.401(h), we examine all relevant facts surrounding a tolling agreement."); Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 32,813 ("[W]hen determining whether a party is a producer or manufacturer of subject merchandise, we look at the totality of the circumstances presented."). Nonetheless, we find Commerce's continuing attempts to distinguish its earlier tolling cases from the instant case unpersuasive.

In support of its assertions, Commerce relies primarily on SRAMS from Taiwan and Polyvinyl Alcohol from Taiwan, in which the tollees participated in manufacturing or processing operations. See SRAMS Remand Response, Jt. App. Tab 7-A at JA-2603, JA-2605 (finding that the tollee design house engaged in research and development, thereby producing the intellectual property that was "one of the primary determinants of the value of individual products"); Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 6,527; Polyvinyl Alcohol from Taiwan, 63 Fed. Reg. at 32,817 (concluding that DuPont was the producer of the subject merchandise, because it manufactured the primary input and shipped it to a toller for further manufacturing).

In a number of other cases, however, it appears that the tollee did not engage in manufacturing or processing operations, and was determined to be a producer based on procurement and continued ownership of inputs or raw materials, payment of processing fees to subcontractors for manufacturing, and overall control of the series of processes (such as purchasing inputs, procuring manufacturing services, and marketing and sales services) involved in creating the final product.  In Certain Pasta from Italy, Commerce determined that Corex was the producer of the subject pasta because Corex "(1) purchase[d] all of the inputs, (2) pa[id] the subcontractor a processing fee, and (3) maintain[ed] ownership at all times of the inputs as well as the final product."

See 63 Fed. Reg. at 53,642. Corex also was "solely responsible for the marketing and sales of the product and any freight arrangements." Id. Corex's involvement in the production of the subject merchandise apparently involved not manufacturing or processing, but managing the successive steps in production of the subject merchandise by procuring and maintaining ownership of the material inputs and subcontracting the manufacturing processes. In Certain Forged Stainless Steel Flanges from India, Commerce found respondent Akai the producer of the subject merchandise, even though Akai did not own the machinery used in producing flanges and apparently did not engage in the actual manufacturing processes. 58 Fed. Reg. 68,853, 68,855-56 (Dep't Commerce Dec. 29, 1993) (notice of final determination of sales at less than fair value). Instead, Commerce's conclusion was premised on the following facts:

> Akai purchase[d] and maintain[ed] title (during the entire course of production) to the raw materials used for the production of the vast majority of the flanges, and . . . direct[ed] and control[led] the manufacturing process insofar as it determine[d] the quantity, size, and type of flanges to be produced. . . . Akai control[led] the costs for all elements incorporated in the production of the flanges.

Id. at 68,856. In explaining its conclusion, Commerce stated that "[t]he Department is required to capture all the costs involved in the production of the subject merchandise, and must therefore look to the company that controls the costs of production of the merchandise." Id.; see also Dep't of Commerce Mem. from Joseph A. Spetrini to Troy Cribb, Issues and Decision Memorandum for the

Final Determination in the Antidumping Duty Investigation of Stainless Steel Butt-Weld Pipe Fittings from Italy at 3 (Dec. 27, 2000) (unpublished), at www.ia.ita.doc.gov/frn/index.html (concluding that a company that "perform[ed] all marketing and selling functions," "purchased the raw material," and "maintained ownership of all materials sent . . . for further production" was the producer of subject merchandise, while the two companies that actually performed manufacturing operations were tollers and not producers); Stainless Steel Bar from India, 65 Fed. Reg. 59,173, 59,174 (Dep't Commerce Oct. 4, 2000) (preliminary results of new shipper antidumping duty administrative review) (finding a company the producer of the subject merchandise where it "(1) [p]urchase[d] all of the inputs, (2) pa[id] the subcontractor a processing fee, and (3) maintain[ed] ownership at all times of the inputs as well as the final product").

In other cases, it appears that the tollee did engage in manufacturing or processing operations, but this fact was not crucial to Commerce's determination that the tollee was the producer. See, e.g., Dep't of Commerce Mem. from Joseph A. Spetrini to Faryar Shirzad, Issues and Decision Memorandum for the Administrative Review of Certain Stainless Steel Wire Rod from India for the Period of Review ("POR") Covering December 1, 1999 through November 30, 2000 at 5 (May 29, 2002) (unpublished), at www.ia.ita.doc.gov/frn/index.html ("[T]he sub-contractor is not the

producer of the wire rod, because the companies of the [tollee] Viraj Group retain ownership of the material and control the sale of the subject merchandise; therefore, [the Viraj companies] are producers of subject merchandise.").  As we stated in USEC I, "'Commerce's construction of "producer," as memorialized in [the regulation], emphasizes three factors: (1) ownership of the subject merchandise; (2) control of the relevant sale . . . ; and (3) control of production of the subject merchandise.'" USEC I, 27 CIT at __, 259 F. Supp. 2d at 1318 (quoting Taiwan Semiconductor Mfg. Co. v. United States, 25 CIT at __, 143 F. Supp. 2d at 966).

In the production of LEU, the utilities manage the successive processes in the production of nuclear fuel, using contractors that perform mining and milling of uranium, conversion of uranium into uranium hexafluoride, enrichment of uranium hexafluoride to obtain LEU, and fabrication of nuclear fuel rods.  See, e.g., USEC I, 27 CIT at __, 259 F. Supp. 2d at 1314, 1322.  The utilities manage the entire process of creating nuclear fuel in order to manage costs and assure a steady and reliable supply of fuel.  See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1316; Oral Arg. Trans. at 47, 53-54. Enrichment is merely one step in this process, and the utilities obtain it by providing a raw material to a subcontractor and paying for the service of enrichment.  As discussed in USEC I, the utilities' management of the process of producing nuclear fuel and their relationship with the enrichers under SWU contracts render

this case very similar to the tolling arrangements seen in earlier cases. Consequently, the fact that the utilities do not subsequently sell the finished product, but rather consume it in the production of electricity, does not render the tolling regulation inapplicable. Moreover, as noted in section I, supra, nothing in the record provides a basis for determining that the tolling arrangements at issue here constitute sales that may be considered equivalent to the full-value sale of a finished product. Accordingly, Commerce's determination that its tolling regulation is inapplicable to this case is neither supported by substantial evidence nor in accordance with law.

**IV. Definitions of "Producer" in the Contexts of Industry Support and the Determination of Export Price or Constructed Export Price**

In USEC I, the Court directed Commerce to assess whether the definition of "producer" in the industry support context should differ from the definition applied in the context of determining export price or constructed export price. See USEC I, 27 CIT at __, 259 F. Supp. 2d at 1328. In addition, the Court directed that "[i]f Commerce finds that the tolling regulation applies here, the agency must consider whether those entities determined to be 'producers' under the tolling regulation are also 'producers' for purposes of the industry support determination." Id.

In its Remand Determination, Commerce concludes that in order to qualify as the producer of a good for the purposes of industry

support, a company must have a "stake" in the domestic industry, which the agency interpreted to mean that a company must be engaged in the "actual production of the domestic like product" in the United States. Remand Determ. at 13 (quoting S. Rep. No. 96-249 at 47 (1979)), 15-16. Commerce reasoned that "[w]hether a company is at risk from unfairly traded imports depends on the nature and extent of its operations in the United States. It stands to reason that a company may be injured by unfairly traded imports where it is in the business of producing the domestic like product." Id. at 14. Commerce further reasoned that the tolling regulation is inapplicable in the industry support context because its application could lead to the inclusion of companies within the domestic industry that would not be adversely affected by unfairly traded imports of merchandise. See Remand Determ. at 16. Commerce claims that such an outcome would defeat the purpose of the unfair trade laws, which exist to aid domestic producers adversely affected by unfair trade. See id. at 16-17; see also Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) ("The purpose underlying the antidumping laws is to prevent foreign manufacturers from injuring domestic industries by selling their products in the United States at less than 'fair value,' i.e., at prices below the prices the foreign manufacturers charge for the same products in their home markets."); Tung Mung Dev. Co. v. United States, 26 CIT __, __, 219 F. Supp. 2d 1333, 1338-39 (2002).

In the context of the less than fair value determination, Commerce maintains that the purpose and intent of the statute warrants application of a different definition of "producer" than is used in the industry support context. Commerce explains that 19 U.S.C. §§ 1677a and 1677b focus on the price of a good, rather than on its manufacture. Remand Determ. at 22-23. Section 1677a refers to the "producer or exporter" of a good in connection with selecting an appropriate respondent and sale price. Id. at 22; 19 U.S.C. § 1677a(a)-(b). Commerce explains that in this context, it may be appropriate to select a toller as the producer when that company, although it may not actually manufacture the good, is responsible for setting the price "at which the merchandise is first sold (or agreed to be sold) before the date of importation." 19 U.S.C. § 1677a(a)-(b); Remand Determ. at 23-24 & n.21.

Absent application of the tolling regulation to the industry support context, Commerce again concludes, as it did in the original determinations, that USEC is the sole domestic producer of LEU. Remand Determ. at 18-20. The agency concludes that for purposes of the industry support determination, the utilities are industrial users and purchasers of LEU, rather than producers, because they do not actually produce LEU in the United States and they do not maintain any manufacturing operations or facilities for the production of LEU. Id. at 19-20 (noting also that the "business interest" of the utilities, "like that of any industrial

user, lies in obtaining lower priced LEU in an effort to keep the cost of producing electricity down"). Consequently, as Commerce concludes that USEC is the sole domestic producer of LEU, the agency finds that the petitions had support within the domestic industry as required by 19 U.S.C. § 1673a(c)(4). See id.

In explaining why it applies the tolling regulation in establishing export or constructed export price, but not in the industry support determination, Commerce has articulated reasons that are consistent with the purposes of the two sections of the statute. In accordance with Commerce's reasoning, we acknowledge that in this case, the utilities would benefit from, rather than be injured by, the availability of lower-priced LEU or enrichment services provided by foreign companies. Consequently, the Court finds Commerce's application of different definitions of "producer" in these two contexts is reasonable and therefore in accordance with law. See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001); Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). As the Court upholds Commerce's reasons for declining to apply the tolling regulation in the industry support context, we also uphold the agency's finding that USEC is the sole member of the domestic industry for the purposes of satisfying the industry support requirement and permitting the investigation to proceed. See 19 U.S.C. §§ 1673a(b)(1), 1673a(c)(4)(A).

## V. Applicability of the Countervailing Duty Statute

Title 19 U.S.C. § 1671 provides that Commerce may impose countervailing duties where it determines that a government or public entity within a country is providing a countervailable subsidy[8] "with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," and imports of that merchandise injure or threaten to injure a domestic industry.[9]  In

---

[8] A "countervailable subsidy" is a "financial contribution" or "any form of income or price support" that confers a benefit.  19 U.S.C. § 1677(5).

[9]  19 U.S.C. § 1671(a) states that
    If -
        (1) the administering authority determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and
        (2) in the case of merchandise imported from a Subsidies Agreement country, the Commission determines that–
                (A) an industry in the United States–
                    (i) is materially injured, or
                    (ii) is threatened with material injury,
                or
                (B) the establishment of an industry in the United States is materially retarded,

        by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

    then there shall be imposed upon such merchandise a countervailing duty . . . equal to the amount of the

its Remand Determination, as in its original determinations, Commerce concludes that the countervailing duty provisions are applicable to both EUP purchase contracts and SWU enrichment contracts.

In the Remand Determination, Commerce notes that "the scope of the CVD law is clearer [than the scope of the antidumping law] in that the plain language of the statute provides that the law is applicable where the merchandise is either imported, or sold for importation, into the United States." Remand Determ. at 84. The agency "interpret[s] the CVD law to apply whenever a foreign government provides subsidies with respect to a class or kind of merchandise that is imported into the United States," and states that "[a]ccordingly, we conclude that the law is applicable to all imports of LEU from the respective countries under investigation."

---

net countervailable subsidy.

19 U.S.C. § 1671(a). "Subsidies Agreement country" is defined in 19 U.S.C. § 1671(b) to mean countries that are WTO members or as to which the United States has undertaken certain obligations. In the case of non-Subsidies Agreement countries, no determination of injury or threat of injury to the domestic industry is required. 19 U.S.C. § 1671(c). France, Germany, the Netherlands, and the United Kingdom are Subsidies Agreement countries. See Membership of the World Trade Organization, WTO Doc. No. 95-2450, WT/L/51/Rev.4 (Aug. 18, 1995), at http://docsonline.wto.org; Agreement Establishing the World Trade Organization, Apr. 15, 1994, 33 I.L.M. 1144, 1144 (1994) (providing that multilateral agreements included in Annex 1, which includes the Subsidies Agreement, are binding on all WTO members).

Id. at 85.[10]

The language of the countervailing duty provisions states that

duties may be imposed where (1) merchandise is imported and (2) a

countervailable subsidy has been provided "with respect to the

manufacture, production, or export" of that merchandise.  19 U.S.C.

§ 1671(a)(1).  Thus, no sale of the subject merchandise is required

for the application of the countervailing duty statute.  Moreover,

in the countervailing duty context, the enricher may be considered

to "manufacture" or "produce" LEU by performing the processing

operations that transform feed uranium into enriched uranium.[11]

See, e.g., Oxford English Dictionary at www.oed.com (defining the

---

[10] Commerce also states that "based up [its] analysis" that the
enrichers "own and hold title to the complete LEU product . . .
and transfer ownership and title to the utility customers for
consideration . . . these [SWU contract] sales are also relevant
for purposes of the CVD law."  Remand Determ. at 83-84.  As
discussed above, we find incorrect Commerce's conclusion that
pursuant to the SWU contracts the enrichers own and transfer
ownership in the complete LEU.  Consequently, contrary to its
statement in the Remand Determination, Commerce's conclusion that
SWU transactions are sales of subject merchandise cannot lend
support to Commerce's countervailing duty finding.  See id.

[11] We concluded in section III, supra, that Commerce's tolling
regulation applies in the antidumping context to designate the
utilities as "producers" of LEU.  That regulation, which is
applicable in the context of determining export price or
constructed export price in order to assess a dumping margin,
does not apply in the countervailing duty context.  Consequently,
for purposes of the countervailing duty determination, the
tolling regulation does not prohibit recognition of a
subcontractor or toll manufacturer as a producer of a good.
Thus, the tolling regulation does not contradict the conclusion
that the enrichers are "producers" of LEU for purposes of a
countervailing duty determination.

verbs "produce" as, <u>inter alia</u>, "[t]o bring forth, bring into being or existence. . . . [t]o bring (a thing) into existence from its raw materials or elements, or as the result of a process; to give rise to, bring about, effect, cause, make (an action, condition, etc.) and "manufacture" as, <u>inter alia</u>, "[t]o make (a product, goods, etc.) <u>from, (out) of</u> raw material; to produce (goods) by physical labour, machinery, etc." and "[t]o make up or bring (raw material, ingredients, etc.) into a form suitable for use; to work up <u>as</u> or convert <u>into</u> a specified product") (emphasis supplied).

Consequently, we find Commerce's interpretation that the statutory countervailing duty provisions are applicable to imports of LEU under both EUP purchase contracts and SWU enrichment contracts reasonable.

There remains the question whether purchases of enrichment services for more than adequate remuneration may constitute countervailable subsidies. Title 19 U.S.C. § 1677(5)(E)(iv) provides that a subsidy which confers a benefit exists "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration." Thus, while the statute explicitly provides a remedy for the provision of subsidies in the form of goods or services, it also explicitly limits purchases that may constitute subsidies to purchases of "goods." 19 U.S.C. §

1677(5)(E)(iv).

As in its original determinations, Commerce concludes in the Remand Determination that the state-owned French electric utility, EdF, purchased a good from and provided a subsidy to the French enricher Eurodif.  See Remand Determ. at 86; see also Low Enriched Uranium from France, 66 Fed. Reg. 65,901, 65,902 (Dep't Commerce Dec. 21, 2001) (notice of final affirmative countervailing duty determination); Dep't of Commerce Mem. from Bernard T. Carreau to Faryar Shirzad, Issues and Decision Memorandum: Final Affirmative Countervailing Duty Determination: Low Enriched Uranium from France – Calendar Year 1999 at 3-5 (Dec. 21, 2001) (unpublished), at www.ia.ita.doc.gov/frn/index.html.  Commerce first bases this conclusion on its finding that SWU transactions constitute sales of LEU, because the enricher obtains ownership of the LEU and transfers ownership to the utility for consideration.  See Remand Determ. at 86-87.  As discussed above, the Court has found this conclusion incorrect.  See supra pp. 11-12.

Commerce also states, however, that even if the SWU transactions do not constitute sales of merchandise, EdF's purchase of enrichment from Eurodif still constitutes a countervailable subsidy.  The agency argues that "[f]irst, there is no question that EdF obtains LEU in a series of purchase transactions (i.e., the purchase of natural uranium, the purchase of conversion, and the purchase of enrichment)."  Id. at 87.  Accordingly, Commerce

argues, EdF's "payment of more than adequate remuneration to Eurodif is made in connection with the major step in the process by which EdF is 'purchasing goods.'" Id. Second, Commerce argues that

> the fundamental purpose of the [countervailing duties] provision is to address subsidization of manufacturing operations that produce subject merchandise. In this context, the purchase of manufacturing or processing is a necessary component of the good. As a practical matter, goods include any manufacturing or processing that is necessary to produce the article. Thus, the sale of manufacturing or processing, which is a necessary component of the good, pertains to the purchase of goods, and does not constitute the purchase of a "service" in this context.

Remand Determ. at 87.

We find Commerce's first argument unpersuasive. We have found that the enrichment transaction here does not constitute a sale of subject merchandise, and the mere fact that enrichment is "purchased" as part of a series of transactions in the nuclear fuel production process simply does not constitute a basis for concluding that the purchase of enrichment processing is tantamount to the purchase of a good. Moreover, it appears from the record that under SWU contracts, Eurodif performs only the enrichment portion of the nuclear fuel production process. Commerce stated in its preliminary countervailing duty determination that "[f]or purposes of this determination, we accept Eurodif's assertion that its operations are no different from those of USEC." Low Enriched Uranium from France, 66 Fed. Reg. 24,325, 24,327 (Dep't Commerce

May 14, 2001) (notice of preliminary affirmative countervailing duty determination and alignment with final antidumping duty determination). If, under SWU contracts, Eurodif performs only the uranium enrichment, then EdF must contract with third parties for the other steps in the production of nuclear fuel, including procuring feed uranium and fabricating LEU into nuclear fuel rods. See supra note 3 (listing the five steps in the production of nuclear fuel). The fact that the utility contracts with third parties, rather than with the enricher, to complete four of the five steps in the nuclear fuel production process renders even less plausible the claim that enrichment is merely part of an overall goods transaction between the utility and enricher.

Commerce's second argument posits that operations resulting in or leading to the production of a good do not constitute "services" for the purpose of the countervailing duty statute. Remand Determ. at 87 ("[T]he sale of manufacturing or processing, which is a necessary component of the good, pertains to the purchase of goods, and does not constitute the purchase of a "service" in this context."). The agency bases this conclusion on its understanding that "the fundamental purpose of the [statutory countervailing duties] provision is to address subsidization of manufacturing operations that produce subject merchandise." Id.

The countervailing duty provisions are "intended to offset any unfair competitive advantage enjoyed by foreign manufacturers or

exporters over domestic producers as a result of subsidies." S.
Rep. No. 103-412, at 88 (1994). To realize this legislative
intent, Commerce interprets the countervailing duty statute to
reach subsidies that help to defray the costs of manufacturing
subject merchandise. Noting that the statute does not define
"service," the agency distinguishes manufacturing services, or
operations that result in the production of a good, from other
types of services which do not result in the production of a good.
See Remand Determ. at 87-88 ("The term 'service' is not defined in
the statute. Under its ordinary meaning, consistent with the
purpose of [19 U.S.C. § 1677(5)(D)], we interpret the term to mean
'[t]he sector of the economy that supplies the needs of the
consumer but produces no tangible goods, as banking and tourism.'")
(internal citation omitted). Under this interpretation, the agency
concludes that even transactions "solely for contract
manufacturing" are covered by 19 U.S.C. § 1677(5)(D), because the
manufacturing operations lead to the production of a good. Remand
Determ. at 88. Essentially, Commerce states that because
manufacturing operations are integral to the good produced,
subsidization of those operations constitutes subsidization of the
good itself. See id. at 89.

Commerce's distinction between manufacturing processes that
lead to the production of subject merchandise and other services
that do not produce tangible goods is consistent with the language

and purpose of the countervailing duty statute.  It is consistent with the statute's language because it preserves a real distinction between "goods" and "services."   It is consistent with the statute's purpose because subsidization of a process essential to the manufacture of a good lowers the manufacturer's cost of producing that good, which may enable the manufacturer to gain a competitive advantage over an unsubsidized competitor.

In the case of enrichment processing, subsidization would lower an enricher's production costs, enabling the enricher to sell enrichment processing at lower prices than an unsubsidized enricher.  This is the type of "unfair competitive advantage" the statute is intended to counter, and therefore, Commerce's interpretation of the statute is reasonable and in accordance with law.  Consequently, we affirm Commerce's determination that purchase of enrichment for more than adequate remuneration may constitute a countervailable subsidy.

## Conclusion

In summary, we find Commerce's explanation of its industry support determination is in accordance with law, and we sustain this portion of the Remand Determination.  We also sustain Commerce's determination that the countervailing duty law may apply to imports of LEU under either LEU purchase contracts or SWU enrichment contracts, as well as the agency's determination that the purchase of enrichment for more than adequate remuneration may

constitute a countervailable subsidy.  Because this opinion is limited to general issues, <u>see</u> Scheduling Order at 4-5 (Aug. 5, 2002), we do not decide here the question whether the LEU imported from the subject countries benefitted from countervailable subsidies.

We also find Commerce's determinations that LEU and SWU contracts are equivalent and that the antidumping provisions are applicable to SWU transactions are neither supported by substantial evidence nor in accordance with law.  Accordingly, with respect to these conclusions, we find that Commerce's Remand Determination is unlawful and we reverse.

The parties are ordered to consult with each other and with the Clerk of the Court and to file a revised scheduling order within sixty days of the date of entry of this opinion.

_____
Donald C. Pogue
Judge


_____
Evan J. Wallach
Judge


_____
Richard K. Eaton
Judge

Dated:    September 16, 2003
          New York, New York