**BROTHER INDUSTRIES (USA), INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Smith Corona Corporation, Defendant–Intervenor.**

**Court No. 91–11–00794.**

United States Court of International Trade.

Sept. 3, 1992.

---

Tanaka Ritger & Middleton, H. William Tanaka, Patrick F. O'Leary, John J. Kenkel, and Michael J. Brown, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, U.S. Dept. of Justice, Civil Div., Commercial Litigation Branch (Vanessa P. Sciarra), Dean Pinkert, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Todd C. Fineberg, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiff, Brother Industries (USA), Inc. ("BIUSA") challenges the decision of the Department of Commerce, International Trade Administration ("ITA"), which rescinded the antidumping duty investigation in *Certain Portable Electric Typewriters*

from Singapore. *See Certain Portable Electric Typewriters from Singapore*, 56 Fed.Reg. 49,880 (Dep't Comm. Oct. 2, 1991) (rescission of initiation of antidumping duty investigation and dismissal of petition) ("Rescission Notice"). ITA rescinded the investigation based on its finding that BIUSA lacked standing to file the petition. Because ITA's decision is not supported by substantial evidence nor in accordance with law, it is reversed and remanded for ITA to complete its investigation of standing.

BIUSA, a Delaware corporation, produces portable electronic typewriters ("PETs"), portable automatic typewriters ("PATs"), and portable word processors ("PWPs") at its factory in Bartlett, Tennessee. The factory was established in 1986, and is a wholly-owned subsidiary of Brother Industries Ltd., Japan. BIUSA's principal competitor in the United States is Smith Corona Corp., which manufactures PETs at its factory in the United States and in its affiliated factory in Singapore.

In 1980, Brother Industries, BIUSA's parent company, was found to be dumping PETs in the United States. *Portable Electric Typewriters from Japan*, 45 Fed.Reg. 30,618, 30,619 (Dep't Comm.1980) (antidumping duty order). In March 1991, several years after BIUSA began U.S. production of PETs, Smith Corona filed a petition alleging that Brother, through BIUSA, was circumventing the antidumping duty order by importing parts and components from Japan and assembling them into finished PETs for sale in the United States.[1] On November 15, 1991, ITA issued a negative final determination concluding that Brother and BIUSA were not circumventing the antidumping order. *Portable Electric Typewriters from Japan (Brother Indus-*

tries, Ltd. and Brother Industries (USA), Inc.), 56 Fed.Reg. 58,031, 58,040 (Dep't Comm.1991) (negative final determination of circumvention of antidumping duty order).

In the meantime, on April 18, 1991, BIUSA filed a petition with ITA, alleging injury to a domestic industry due to less than fair value sales of PETs from Singapore. Smith Corona countered that Brother lacked standing to file the petition because Brother was not an "interested party" that had filed "on behalf of" a domestic industry. *See* 19 U.S.C. § 1673a(b)(1) (1988). In essence, Smith Corona argued that BIUSA was merely an assembler of PETs, and not a manufacturer or producer. *Rescission Notice*, 56 Fed.Reg. 49,880. On October 2, 1991, ITA determined that BIUSA was not an interested party and terminated the investigation. *Id.* ITA did not reach the issue of whether BIUSA filed the petition on behalf of the domestic industry. This appeal followed.

## STANDARD OF REVIEW

ITA's determination will be sustained if it is supported by substantial evidence on the record and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

BIUSA argues ITA's determination that BIUSA is not an interested party is unsupported by substantial evidence, relies on a new test that is an arbitrary departure from established practice, and fails to consider factual developments that occurred prior to the determination.

---

**1.** The anticircumvention statute, 19 U.S.C. § 1677j provides, in part:

 (1) **In general**
 If—
 (A) merchandise sold in the United States is of the same class or kind as any other merchandise that is the subject of—
 (i) an antidumping duty order ...
 (B) such merchandise sold in the United States is completed or assembled in the United States from parts or components produced in the foreign country with respect to which such order or finding applies, and

 (C) the difference between the value of such merchandise sold in the United States and the value of the imported parts and components ... is small,
the administering authority, after taking into account any advice provided by the [United States International Trade] Commission ..., may include within the scope of such order or finding the imported parts or components ... that are used in the completion or assembly of the merchandise in the United States at any time such order or finding is in effect.
19 U.S.C. § 1677j(a)(1) (1988).

### 1. BIUSA's Operations at Bartlett, Tennessee

BIUSA has invested $13 million in its plant at Bartlett, Tennessee, and employs 450 people. BIUSA produces PETs, PATs, and PWPs at Bartlett, which are distributed by its affiliate, Brother International Corporation. Most of BIUSA's investment is related to production of PETs and PATs. The plant has three product assembly lines and one printed circuit board ("PCB") assembly line. Two assembly lines are devoted to PETs, and one to PWPs. Many of the 450 employees work on the assembly lines performing more than 300 tasks. The operations at Bartlett consist of welding of the chassis or metal frame from fabricated metal parts. The PCBs are then assembled, using parts from outside vendors. The electronic components are inserted either automatically or manually onto the boards. Electrical connections are made with a soldering machine; some components require manual soldering, which is a specialized skill. BIUSA has commenced production of its own liquid crystal display ("LCD") circuits. The LCDs, circuit boards and other electronic components are purchased; at the factory, they are inserted onto the board and the electronic components are soldered. All plastic housing, ribbons, correction tapes, cartons, and packing materials are sourced in the United States, and BIUSA estimates that outside vendors employ an additional 2,000 people, who spend approximately twenty percent of their time manufacturing for BIUSA.

### 2. Applicable Law

An antidumping proceeding shall be commenced when an "interested party" files a petition "on behalf of" the domestic industry, and meets the other requirements of the statute. 19 U.S.C. § 1673a(b)(1) (1988). An "interested party" is defined, *inter*

*alia*, as a "manufacturer, producer, or wholesaler in the United States of a like product." 19 U.S.C. § 1677(9)(C) (1988).

■ To determine whether BIUSA was an interested party with standing to file a petition, ITA considered "the overall nature of [BIUSA's] production-related activities in the United States," including the following specific factors:

(1) the extent and source of [its] ... capital investment; (2) the technical expertise involved in the production activity in the United States; (3) the value added to the product in the United States; (4) employment levels; (5) the quantity and types of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product....

No single factor is determinative, nor is the list of criteria exhaustive. *Rescission Notice*, 56 Fed.Reg. at 49,880.[2]

### 3. ITA's Decision

ITA found that the absolute levels of investment and employment were not instructive given the high output from the plant. It discounted both elements, finding that neither argues strongly for or against BIUSA's status as a domestic producer. After describing BIUSA's operations at Bartlett, ITA characterized the level of technical expertise as "what could be expected in any large assembly operation." 56 Fed.Reg. at 49,881. ITA then turned to value-added. It described value-added as "perhaps not small ... [but] not significant," and noted that this factor alone is not dispositive since "one can envision cases in which a similar degree of domestic value is added by a firm determined to be a domestic producer." *Id.* ITA found that the quantity and types of parts sourced in the United States were non-critical, and that the primary mechanical and electronic elements were imported.

**2.** The factors on which ITA relied were drawn from the domestic injury determinations of the International Trade Commission ("ITC"). In choosing to rely on these factors, ITA declined to use Smith Corona's U.S. operations as a "benchmark" by which to measure the extent of BIUSA's operations in the United States. ITA found no authority for such a comparative approach, and noted that a "comparative analysis may simply lead to the irrelevant conclusion that one U.S. firm is 'more interested' than another." 56 Fed.Reg. at 49,880. On appeal, both parties devote substantial verbiage to a comparison of operations at the Smith Corona and BIUSA facilities. The analysis is not fruitful, and the court rejects it for the same reasons as did ITA.

ITA then turned to the final factor—other costs and activities leading to production of the like product. This factor proved dispositive. ITA found:

> Brother's products have been developed, designed, and engineered outside the United States over several years. While this, due to the fact that this product is not new, means that such activities are no longer large quantitatively, they remain an important factor in determining Brother's status as a domestic producer, because design is an essential part of producing a manufactured product. Though some market research is done by Brother in the United States, this is to be expected in the course of selling any product, domestic or imported. It is however, much less critical to the manufacture of a product than is the research, development, design and engineering activity. This factor, when considered in combination with the nature of Brother's operation, the low number of domestic parts, and its domestic value-added, is one of the most compelling factors affecting our analysis.
>
> The nature of Brother's operation is qualitatively different from the type of operation characterized by design, engineering, and the actual manufacturing of some of the essential parts, to which Congress intended to afford a remedy.

*Id.* ITA concluded that BIUSA was not an interested party under the statute and lacked standing to maintain the action.

### 4. Failure to Consider Information through Date of Determination

 BIUSA argues that ITA relies on facts as of the spring of 1991, and ignores developments occurring from that time until the date of the rescission notice in October 1991. Specifically, in June 1991, BIUSA informed ITA that its capital investment would rise to $16 million, and the number of employees would increase to 600. BIUSA also claims error because LCD production was ignored.

ITA apparently rejected information concerning increases in investment and employment because BIUSA failed to document the manner in which increases were related to PET production, as opposed to the entire plant. In fact, ITA believed, not unreasonably, that the increases in capital investment would go towards production of PWPs. As for LCD production, BIUSA's submission on June 25, 1991 is ambiguous and does not make clear how PET production will be affected.[3]

Accordingly, ITA did not err in disregarding the projected increases.

### 5. Erroneous Application of Six–Factor Test

 BIUSA argues that ITA's findings concerning the six ITC factors are unsupported by substantial evidence, and that ITA has elevated the sixth factor, specifically the situs of research, development, design and engineering activity, above all others. BIUSA also argues that ITA's findings are untenable in light of several prior determinations by ITA and ITC that the Bartlett plant is part of the domestic industry.

The prior determinations [4] on which BIUSA relies involve a different agency, stat-

---

**3.** BIUSA's submission states:

> BI(USA) also commenced the making of its own LCD circuits. Some of these will be used on PATs. The process is similar to that employed in making PCBs. The LCDs, the circuit boards, and other electronic components are purchased. At the factory, they are inserted onto the board and electrical connections are soldered.

*Administrative Record* ("A.R."), Reel 1, Frame 1472.

**4.** BIUSA cites the following determinations: *Portable Electric Typewriters from Japan (Broth-*

*er Industries, Ltd. and Brother Industries (USA), Inc.,* 56 Fed.Reg. 46,594, 46,596 (Dep't Comm. Sept. 13, 1991)) (neg. prelim. det. of circumvention of antidumping duty order) (BIUSA's production facilities have surpassed simple assembly operation and it is not circumventing the antidumping duty order on PETs from Japan); *Certain Personal Word Processors from Japan,* USITC Pub. 2411, Inv. No. 731–TA–483 (Final), at 19–20 (Aug.1991) (BIUSA engages in sufficient production-related activity to be domestic producer of personal word processors; production activity is *assembly* of sophisticated components, not production of parts or components);

ute or product, and thus, cannot be said to bind ITA; yet, in the light of the rescission notice, they do suggest a certain schizophrenia at the administrative level. Furthermore, the court notes that both sides rely on ITC decisions that have interpreted the ITC test, so that pertinent ITC opinions cannot be ignored totally. More importantly, this court's review of ITA's analysis reveals that contrary to the governing statute ITA has improperly focused on whether the product is "domestic," rather than whether BIUSA is engaging in manufacturing in the United States.

■ To have standing to file a petition, a party must be a "manufacturer, producer, or wholesaler." 19 U.S.C. § 1677(9)(C) (1988). These terms are not defined in the statute, but the legislative history states that the "standing requirements [should] be administered to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S.Rep. No. 96–249, 96th Cong., 1st Sess. 63 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 449. The language in the legislative history is broad and unqualified. It contrasts industries suffering *adverse effect* with those having *no stake:* the former have standing; the latter do not. Nothing suggests that a petitioner must make anything more than a threshold showing of injury. Thus, the legislative history calls for a liberal construction of the standing requirements. *See Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1203, 704 F.Supp. 1075, 1084 (1988).

■ ITA's analysis, however, imposes burdens on a petitioner for which there is no support in the statute or legislative history. ITA elevates the situs of research,

development, design and engineering to a primary position. As BIUSA notes, based on ITA's analysis, without U.S. research and development, a "company is cast outside the pale of qualified antidumping petitioners." *Reply Brief,* at 8. Thus, any company that is manufacturing a product that has been researched and developed outside the United States likely would be disqualified under ITA's analysis. The statute grants petitioner status to an industry that is at risk of injury due to dumped imports. *See* S.Rep. No. 96–249, 96th Cong., 1st Sess. 63 (1979). According to ITC's six-factor test, whether a company is at risk depends on the nature and extent of its operations in the United States. It does not, as ITA suggests, depend on a showing that its product is "domestic" in the sense that it was conceived and developed in the United States. A company may be a U.S. manufacturer for purposes of the standing requirements even though its product is designed abroad.

Smith Corona claims that the record establishes the importance of the design and engineering factors to the determination. Yet, Smith Corona does not provide citations to the record nor elaborate on its argument. It also cites two ITC cases; it claims the linchpin of those decisions was the location of the creative or production processes. *See Certain Radio Paging and Alerting Receiving Devices from Japan,* USITC Pub. 1410, 731–TA–102 (Final) (Aug. 1983) (finding *based on number of factors* that company conducting design and engineering in United States and assembly offshore is domestic producer, but that companies conducting design and engineering in Japan and assembly in United States are not domestic producers); *3.5″ Inch Microdisks and Media Therefor from Japan,* USITC Pub. 2170, Inv. No. 731–TA–

*Portable Electric Typewriters from Singapore,* USITC Pub. 2388, Inv. No. 731–TA–515 (Preliminary), at 11 (June 1991) (BlUSA engages in sufficient production-related activity to be domestic producer of PETs, PATs, and personal electric word processors).

BIUSA also relies on the memorandum of the Deputy Assistant Secretary for Investigations to the Assistant Secretary for Import Administration, in which the Deputy Assistant recom-

mended a determination that BIUSA has standing as an interested party to bring the petition. *Mem. from Francis J. Sailer, Deputy Asst. Sec. for Invest. to Eric I. Garfinkel, Ass't Sec'y for Import Admin. re: Antidumping Duty Invest. of PETs from Singapore.* The Assistant Secretary disagreed, and the Deputy Assistant's recommendation was not adopted. A.R., Reel 4, Frame 1340A–1351A.

389 (Final), at 20–21 (Mar. 1989) (domestic industry consists of companies that produce or assemble coated media or microdisks in United States; discussing under *related party provisions* status of companies that import some materials from Japan). These cases do not go as far as Smith Corona suggests. Moreover, ITC has plainly stated that the situs of research and development is not dispositive, and its relative importance declines as an industry matures. *Cellular Mobile Telephones and Subassemblies Thereof from Japan,* USITC Pub. 1786, Inv. No. 731–TA–207 (Final), at 9 n. 15 (Dec. 1985). As BIUSA has noted, the industry at issue here is a mature industry. This is not to say that the standing requirements are without teeth or that a company that merely completes a product in the United States would have standing. In this case, however, ITA has erected an onerous and unwarranted barrier to BIUSA's petition.

▮▮▮▮ In emphasizing the situs of design and engineering, ITA has given inadequate consideration to several other factors such as capital investment and employment levels, even though it characterized these factors as "substantial" and "not insignificant." It also fails to note that BIUSA's U.S. value-added figures, even as calculated by ITA, compare favorably to at least one other case where ITC found the firm was part of the domestic industry.[5] *Low-Fuming Brazing Copper Wire and Rod from New Zealand,* USITC Pub. 1779, Inv. No. 731–TA–246 (Final), at 7 (Nov. 1985) (U.S. value-added estimated at twenty percent). No adequate explanation for distinguishing this case has been provided. Moreover, ITA's disregard of the value-added, based on its belief that a determined firm could inflate domestic value, is com-

pletely unsupported by the record. Finally, the fact that BIUSA imports critical component parts from Japan does not preclude a finding that BIUSA is an interested party. *See Digital Readout Systems and Subassemblies Thereof from Japan,* USITC Pub. 2150, Inv. No. 731–TA–390 (Final), at 13–14 (Jan. 1989).

6. Remand to Complete Standing Inquiry

▮▮▮▮ In short, ITA's analysis is not supported by the statute or legislative history. ITA has discretion to utilize any methodology reasonably suited to fulfilling the statutory goals. Here, ITA has elected to use the ITC analysis to determine whether or not a party is a manufacturer. The parties do not object to this analysis, only to the manner in which it is applied in this case. If ITA chooses to use the ITC test, as it has done here, it must do so fairly and with due regard to statutory language. Here, ITA's focus on the situs of design and engineering leads to an unwarranted concern with the intrinsic nature of the product rather than the nature of production in the United States. Because ITA's determination that BIUSA is not a manufacturer is not supported by substantial evidence and is not in accordance in law, it cannot stand. Moreover, a fair application of the ITC factors to the facts of record demonstrates that BIUSA is a United States "manufacturer" with a clear stake in the outcome of the antidumping investigation. The investment and employment levels at BIUSA, even as characterized by ITA, are not insignificant. The value-added is also significant, and at least as great as in another case where a firm has been found to be part of the domestic industry.

---

**5.** The record contains several sets of figures for U.S. value-added. The Deputy Assistant Secretary's Memorandum calculated U.S. value-added at a certain percentage based on four PET/PAT models subject to the anticircumvention inquiry. BIUSA argues that this calculation includes two word processing machines that are not part of this investigation, and that the figures without these machines are actually higher. It appears, however, that these two models have been found to be within the class or kind of merchandise. *Portable Electric Typewriters From Japan,* 55 Fed.Reg. 47,358 (Dep't Comm. 1990), *aff'd, Matsushita Electric Indust. Co. Ltd. v. U.S.,* 16 CIT ——, 787 F.Supp. 1461 (1992). BIUSA also argues that its own figures are substantially higher than ITA's due to the fact that it allocates expenses to the situs where incurred, whereas ITA allocates expenses incurred in the United States to U.S. and non-U.S. value. BIUSA has failed, however, to demonstrate error in ITA's calculation of U.S. value-added.

Based on the record before the court, and the test selected by ITA, the fact that BIUSA performs design and engineering abroad, or that major parts are imported does not preclude a finding that it is part of the domestic industry. BIUSA's operations at Bartlett can only be described as "manufacturing." Accordingly, ITA's determination is reversed, and the case is remanded for ITA to consider whether BIUSA has filed the petition "on behalf of" the domestic industry, and if so, to proceed with an investigation under the antidumping laws.