# United States Court of Appeals for the Federal Circuit

04-1209, -1210

EURODIF S.A.,
COMPAGNIE GENERALE DES MATIERES NUCLEAIRES,
and COGEMA, INC.,

Plaintiffs-Appellants,

and

AD HOC UTILITIES GROUP,

Plaintiff-Appellant,

v.

UNITED STATES

Defendant-Cross Appellant,

and

USEC INC. and UNITED STATES ENRICHMENT CORPORATION,

Defendants-Cross Appellants.

Stuart M. Rosen, Weil, Gotshal & Manges LLP, of New York, New York, argued for plaintiffs-appellants Eurodif S.A., et al. With him on the brief were Gregory Husisian, of Washington, DC, and Jennifer J. Rhodes, of New York, New York.

Nancy A. Fischer, Shaw Pittman LLP, of Washington, DC, argued for plaintiff-appellant AD HOC Utilities Group. With her on the brief were Stephan E. Becker, Sanjay J. Mullick, and Joshua D. Fitzhugh.

Stephen C. Tosini, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant United States. On the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Of counsel on the brief were John D. McInerney, Chief Counsel, Berniece A. Browne, Senior Counsel, and Robert L. Lafrankie, Senior Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

Sheldon E. Hochberg, Steptoe & Johnson LLP, of Washington, DC, argued for defendants-cross appellants USEC Inc., et al. With him on the brief were Richard O. Cunningham, Eric C. Emerson, Matthew S. Yeo, Evangeline D. Keenan, and Alexandra E.P. Baj.

Appealed from: United States Court of International Trade

Judge Donald Pogue

# United States Court of Appeals for the Federal Circuit

04-1209, -1210

EURODIF S.A.,
COMPAGNIE GENERALE DES MATIERES NUCLEAIRES,
and COGEMA, INC.,

Plaintiffs-Appellants,

and

AD HOC UTILITIES GROUP,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant,

and

USEC INC. and UNITED STATES ENRICHMENT CORPORATION,

Defendants-Cross Appellants.

_____

DECIDED:  March 3, 2005

_____

Before BRYSON, <u>Circuit Judge</u>, PLAGER, <u>Senior Circuit Judge</u>, and PROST, <u>Circuit Judge</u>.

PROST, <u>Circuit Judge</u>.

This interlocutory appeal comes to us from the United States Court of International Trade, which certified four separate questions for appeal to this court.  The Ad Hoc Utilities Group ("AHUG"), Eurodif S.A. ("Eurodif"), Compagnie Generale des Matieres Nucleaires ("CGMN") and Cogema, Inc. appeal two issues from the Court of

International Trade. The United States, USEC, Inc. and the United States Enrichment Corporation (the latter two collectively referred to as "USEC" in this opinion) cross-appeal two issues. We affirm the Court of International Trade's decision affirming the Department of Commerce's ("Commerce") industry support determination. We also affirm the court's decision that uranium enrichment contracts constitute a provision of services, rather than a sale of goods. Finally we reverse the court's decision regarding subsidies, and hold that overpayment for uranium enrichment services by foreign government entities cannot constitute a countervailable subsidy. Because we need not review the court's decision regarding Commerce's application of the tolling regulation in the context of export price determination, we decline to do so.

## BACKGROUND

Enriched uranium fuel rods are used by the utility industry to generate nuclear power. The process of producing those rods involves multiple steps. First, uranium ore must be mined. Second, the ore must be milled or refined into concentrated uranium. Third, that concentrated uranium must be converted into uranium hexafluoride. Fourth, that uranium hexafluoride must be enriched into low enriched uranium ("LEU"). Fifth, and finally, LEU is used to fabricate uranium rods. This case involves the fourth step in the process of creating uranium rods—the enrichment of uranium hexafluoride into LEU.

Many utilities in the United States contract to buy uranium from a third-party seller and then contract to have that uranium enriched by a uranium enricher. Only one entity in the United States enriches uranium into LEU—USEC, formerly an arm of the federal government. A variety of foreign enrichers, including Eurodif, CGMN and

Cogema, compete with USEC and also enrich the uranium of American utility companies.[1]

Contracts for enriched uranium come mainly in two different forms. The first form involves contracts that provide money for the sale of enriched uranium, otherwise known as enriched uranium product, or EUP, contracts. The second form, the form relevant to this appeal, involves the transfer of unenriched uranium by a buyer to an enricher and the purchase of separative work units ("SWU") from the enricher. In these SWU contracts, the enricher enriches the unenriched uranium and delivers LEU to the purchaser. Although the enricher may not necessarily produce a particular utility's LEU from the uranium that utility provides to the enricher, the utility retains title, during the enrichment process, to the quantity of unenriched uranium that it supplies to the enricher.

In most of the transactions relevant to this case, AHUG and American utilities entered into SWU contracts with European enrichers. These utilities compensated enrichers to process unenriched uranium into LEU. In another critical transaction, a partially public French utility, Electricite de France ("EdF"), entered into an SWU contract with French enricher Eurodif. In that contract, EdF allegedly paid Eurodif greater than adequate compensation for the enrichment of uranium.

On December 7, 2000, USEC petitioned Commerce to undertake an antidumping and countervailing duty investigation focusing on LEU coming from France, Germany, the Netherlands, and the United Kingdom. On December 21, 2001, Commerce issued

---

[1] The Court of International Trade thoroughly documented the factual background to this case in its opinion. See USEC Inc. v. United States, 281 F. Supp. 2d 1334 (Ct. Int'l Trade 2003) ("USEC II").

its final determinations in that investigation. Those determinations focused on two main issues: (1) whether SWU contracts were contracts for the sale of goods and not services and, therefore, subject to U.S. antidumping and countervailing duty statutes, and (2) whether domestic utilities or foreign enrichers were "producers" of LEU for the purposes of determining whether or not there was sufficient industry support to begin an antidumping and countervailing duty investigation in the first place. In its final determinations, Commerce concluded that SWU contracts are contracts for the sale of goods and not services. It also decided that the foreign enrichers of uranium, and not the domestic utilities, were "producers" of LEU.

AHUG and the foreign enrichers party to this case appealed Commerce's determination to the Court of International Trade, arguing that a uranium enrichment contract is a contract for the provision of services and not the sale of goods and, therefore, not subject to federal antidumping and countervailable subsidy statutes. AHUG also disputed Commerce's contention that only the foreign enrichers are "producers" for domestic industry support determination purposes, arguing that Commerce's determination that foreign enrichers were "producers" of LEU was inconsistent with its prior decisions. AHUG further contended that if the domestic utilities are considered producers of LEU, Commerce would not have sufficient domestic industry support to commence an investigation pursuant to 19 U.S.C. § 1673a(c)(4).

The Court of International Trade agreed with AHUG and determined that Commerce's characterization of the enrichment contracts between AHUG and foreign enrichers as contracts for the sale of goods was not sustainable. USEC Inc. v. United States, 259 F. Supp. 2d 1310, 1324-26 (Ct. Int'l Trade 2003) ("USEC I"). It also found

that Commerce's determination that the foreign enrichers were "producers" of LEU was against the weight of the evidence and inconsistent with prior Commerce decisions. Id. at 1317-26. As a result, the court remanded the case to allow Commerce to reconsider its determinations.

In its remand determination, Commerce reiterated its original positions. Final Remand Determination, USEC Inc. and United States Enrichment Corp. v. United States (June 23, 2003) ("Remand Determination"). AHUG and the foreign enrichers then appealed that remand determination to the Court of International Trade. In its second consideration of Commerce's determinations, the court concluded that (1) Commerce's interpretation of the word "producer" in the context of making an industry support determination was reasonable and in accordance with law; (2) uranium enrichment contracts were contracts for services and not for goods; (3) payment by a foreign government entity of more than adequate remuneration to a foreign enricher for enrichment services qualified as a countervailable subsidy; and (4) Commerce's interpretation of the word "producer" for the purposes of making an export price determination was inconsistent with its previous determinations in other cases and thus not in accordance with law. USEC Inc. v. United States, 281 F. Supp. 2d 1334 (Ct. Int'l Trade 2003) ("USEC II").

Because the resolution of the issues decided by the court in USEC II are potentially dispositive of this entire case, the Court of International Trade certified four specific questions for appeal to this court. The four certified questions are:

(1) Whether Commerce's decision not to apply its tolling regulation to determine whether American utilities should be considered "producers" of low enriched uranium

(LEU) for the purposes of determining whether there was enough domestic industry support to proceed with an investigation is in accordance with law. (Commerce determined that foreign enrichers and not domestic utilities were "producers" of LEU for the purposes of determining domestic industry support. Remand Determination at 6-36.)

(2) Whether Commerce's decision that the enrichment of uranium feedstock pursuant to separative work unit (SWU) contracts constitutes a sale of goods instead of services is supported by substantial evidence and in accordance with law. (Commerce determined that SWU contracts like EUP contracts are contracts for the sale of goods. Remand Determination at 70-81.)

(3) Whether Commerce's decision that payment of more than adequate remuneration for enrichment services by partially public foreign entities to foreign enrichers constitutes a countervailable subsidy is in accordance with law. (Commerce determined that the transaction between EdF and Eurodif was a sale of goods to a government entity for more than adequate remuneration and, therefore, subject to the countervailing duty statute. Remand Determination at 82-99.)

(4) Whether Commerce's decision to apply a definition of "producer" in the context of export price determination that is different from the definition it used in the industry support determination is reasonable and therefore in accordance with law. (Commerce determined that foreign enrichers were "producers" of LEU for the purposes of determining LEU export price. Remand Determination at 69-70.)

We have jurisdiction to hear this appeal under 28 U.S.C. § 1292(d)(1).

**DISCUSSION**

In reviewing the Court of International Trade's decisions in this case, we apply the same standard used by that court in evaluating Commerce's determinations, findings and conclusions and hold unlawful any decisions found to be unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

## A. The Tolling Regulation and Commerce's Industry Support Determination

Before an antidumping and countervailing duty investigation can be initiated, the petition on which that investigation is based must meet certain industry support requirements. A petition is considered to be filed on behalf of an industry if:

> (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

> (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A) (2000).

Commerce determined that in order to be a producer, an entity must have a "stake" in the domestic industry in question. Commerce then defined having a "stake" as undertaking the "actual production of the domestic like product" within the United States. Remand Determination at 13. Commerce's industry support determination considered USEC to be the only domestic producer of LEU. Accordingly, Commerce found that there was sufficient domestic industry support to begin an antidumping and countervailing subsidy investigation. The Court of International Trade affirmed

Commerce's determination that foreign uranium enrichers were "producers" for the purposes of § 1673a(c)(4)(A).

On appeal, appellants AHUG, Eurodif, CGMN and Cogema argue that American utility companies should be considered "producers" for the purposes of determining whether USEC's petition has sufficient industry support to trigger Commerce's antidumping and countervailing duty investigation. In support, they note that Commerce's tolling regulation orders Commerce not "to consider a toller or subcontractor to be a manufacturer or producer where the toller or subcontractor does not acquire ownership, and does not control the relevant sale, of the subject merchandise or foreign like product." 19 C.F.R. § 351.401(h) (2004). According to the appellants, if the tolling regulation were applied in this case, Commerce could not initiate any antidumping or countervailing duty investigation because the domestic utilities would be considered "producers" for the purposes of an industry support determination—and given such a definition of "producer," the dictates of § 1673a(c)(4)(A) would not be satisfied. They draw further support for their argument from prior Commerce determinations that held that control of the aspects of manufacture is sufficient to qualify an entity as a "producer." Finally, they buttress their argument by alleging that Commerce improperly and inconsistently applied the tolling regulation by using it to determine the export price of LEU but declining to apply it in its industry support determination.

The Court of International Trade rejected AHUG's argument and sustained Commerce's interpretation of the term "producer" for the purpose of an industry support determination as well as its refusal to apply the tolling regulation to encompass

American utilities within the definition of the term "producer."  USEC II, 281 F. Supp. 2d at 1346.  The court supported its holding by determining that Commerce's use of the tolling regulation was in keeping with the purposes of the industry support statute and that Commerce's interpretation of the word "producer" was reasonable and, thus, in accordance with law.  Id.  On this issue, we agree with the Court of International Trade and affirm Commerce's initial industry support determination.

Commerce's determination that domestic utilities were not "producers" of LEU is consistent foreign enrichers, and not domestic utilities, were "producers" of LEU is consistent with the purpose of § 1673a(c)(4)(A).  Section 1673a(c)(4) speaks of "industry support" and, as expressed in legislative history,  Congress intended the industry support statute "to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation."  S. Rep. No. 249, 96th Cong., 1st Sess. 47 (1979).  This view was echoed by the Court of International Trade when it noted that "[t]he language in the legislative history is broad and unqualified.  It contrasts industries suffering adverse effect with those having no stake: the former have standing, the latter do not."  Brother Indus. (USA), Inc. v. United States, 801 F. Supp. 751, 757 (Ct. Int'l Trade 1992).  Commerce interpreted having a "stake" as requiring that a company "perform some important or substantial manufacturing operation."  Remand Determination at 14 (internal quotations and citations omitted).  There is no basis to conclude that Commerce's interpretation in this context is unreasonable or not in accordance with law.

Further, determining the export price of a good and determining whether a petition has enough support for an investigation to be initiated are two different tasks

that were delegated to Commerce for different purposes. Thus, using the tolling regulation in one context but not using it in another is a clearly insufficient basis upon which to conclude that Commerce's action was not in accordance with law.

## B.  The Characterization of Enrichment Contracts

Under the statutory scheme adopted by Congress, the sale of goods (or "merchandise") is covered by the antidumping duty statute.  See 19 U.S.C. § 1673.  The provision of services, however, is not covered by that statute.

In a previous case dealing with SWU contracts and the Contract Disputes Act ("CDA"), we agreed with the government's argument that an SWU contract for the enrichment of uranium is a service contract and, thus, not covered by the CDA.  See Fla. Power & Light Co. v. United States, 307 F.3d 1364 (Fed. Cir. 2002).  The parties dispute the relevance of Florida Power to this case.

On appeal, the government and USEC submit that Commerce's finding that SWU contracts are contracts for the sale of goods is supported by substantial evidence and in accordance with law and that the Court of International Trade's holding to the contrary should be reversed.  They rely on three principal contentions.

First, they argue that this court's precedents in NTN Bearing Corp. of Am. v. United States, 368 F.3d 1369 (Fed. Cir 2004), AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000), and NSK Ltd. v. United States, 115 F.3d 965 (Fed. Cir. 1997) support their argument that the SWU contracts in question were sales of merchandise and not arrangements for services.  They point to this court's construction of the word "sold" in NSK as supporting the view that a sale requires "both a transfer of ownership to an unrelated party and consideration."  See NSK, 115 F.3d at 975.  They

also cite to our opinions in <u>AK Steel</u> and <u>NTN</u> as supporting this construction. According to the government and USEC, this straightforward interpretation should cover the SWU contracts because those contracts involved a transfer of title to LEU from the enricher to the utilities upon sampling and weighing of the LEU and consideration paid by the utilities to the enrichers.

Second, the government and USEC assert that Commerce's characterization of the SWU contracts as contracts for the sale of goods is in keeping with the general purpose of the antidumping statute, which they articulate as "provid[ing] domestic producers protection from all dumped imports."

Third, the government and USEC point to the deferential standard of review under which we review Commerce determinations as precluding a reversal of Commerce's determination on this issue. They argue that because Commerce's determination that SWU contracts are contracts for the sale of goods is, in their eyes, supported by substantial evidence and in accordance with law, we should affirm it.

It is on these grounds, according to the appellants, that <u>Florida Power</u> is inapposite to this case. Because <u>Florida Power</u> dealt with a contractual dispute under the CDA and not an antidumping investigation, it is not, in their view, applicable here. Moreover, they argue that <u>Florida Power</u> stands for the proposition that "SWU contracts [fall] into neither [the category of sales of goods nor the category of contracts for services]." As support, they point to language in our opinion in <u>Florida Power</u> that indicates that an SWU contract "does not fall neatly into" either side of the goods-services divide. <u>See</u> <u>Fla. Power</u>, 307 F.3d at 1373. The government and USEC

consider this language sufficient to support Commerce's determination given the deferential standard of review to be applied in this case.

The Court of International Trade rejected Commerce's determination that the SWU contracts in this case were contracts for the sale of goods and not services, resting its decision on the fact that the enrichers never obtained ownership of either the feed (unenriched) uranium during enrichment or the final LEU product. USEC II, 281 F. Supp. 2d at 1339. Furthermore, according to the court, the SWU contracts between the utilities and the enrichers demonstrated "an intention to establish a continuous chain of ownership in the utility while maintaining the enricher's ability to cover its obligations under the contract should it encounter difficulties in producing or providing LEU for a customer." Id. The court also found that "nothing in the evidentiary record supports a determination that the enricher has any ownership rights [under the SWU contracts]." Id. at 1340. Agreeing with the Court of International Trade, we reject Commerce's determination that the SWU contracts in this case are contracts for the sale of goods.

In reviewing the contracts in this case, it is clear that ownership of either the unenriched uranium or the LEU is not meant to be vested in the enricher during the relevant time periods that the uranium is being enriched. While it is correct that a utility may not receive the LEU that was enriched from the exact unenriched uranium that it delivered to the enricher, it is nevertheless true that up until the sampling and weighing of the LEU before delivery, the utility retains title to the quantity of unenriched uranium that is supplies to the enricher. The utility's title to that uranium is only extinguished upon the receipt of title in the LEU for which it contracted. Therefore, the SWU contracts in this case do not evidence any intention by the parties to vest the enrichers

with ownership rights in the delivered unenriched uranium or the finished LEU. As a result, the "transfer of ownership" required for a sale under NSK is not present here.

As previously noted, we explicitly dealt with whether or not SWU contracts were contracts for services or goods in Florida Power (albeit in the context of a CDA claim and not in the context of an antidumping investigation). In that case, the government argued that SWU contracts were contracts for services and not goods. There, the government pointed out in its briefs that the SWU contracts in that case consistently referred to "enrichment services" and that the "fundamental purpose" of those contracts was "the provision of enrichment services." The government further declared that the utilities' argument in that case that the SWU contracts arranged for the sale of goods because title passed between utilities and enrichers "rest[ed] on [a] technicality."[2]

The relevant SWU contract terms in that case are identical to the contract terms in this case. Indeed, the government successfully defeated the CDA claim of the utilities in Florida Power solely on the ground that the SWU contract in that case was a contract for services and not for goods. And while Florida Power is not binding precedent for this case because of the different statutory scheme involved, we find its reasoning and its conclusion persuasive.

---

[2] The title argument that "rest[ed] on [a] technicality" in that case is strikingly similar to the title argument that the government advances in this case. There, the government argued that despite the temporary transfer of title of uranium from the utility to the enricher, the fact that the utilities were entitled to claim any leftover material from uranium enrichment (also known as "tails") showed that the SWU contract was a contract for services. Here, the utilities were likewise contractually entitled to reclaim the uranium "tails" and title to the quantity of unenriched uranium transferred by the utility only passed to the enricher once the utilities received title to the LEU from the enrichers.

In addition, while it is true that we stated that SWU contracts "[do] not fall neatly into either [a sale of goods or a contract for services]," our opinion definitively held that the SWU contract in that case was a contract for the provision of services. Fla. Power, 307 F.3d at 1373.[3] Holdings of this court are no less decisive because they may have been difficult to develop. Indeed, our characterization of the SWU contract in Florida Power, however we may have arrived at it, created the sole basis for denying the utilities in that case relief under the CDA. And even under the deferential standard of review that we apply in this case, we choose not to ignore our previous holdings, particularly where the circumstances in a previous case are nearly identical to the case at hand.

Moreover, while the statutory schemes involved in Florida Power and those involved in this case are different, they do not change the essential nature of the transaction involved in this case. Even though the government is correct in arguing that

---

[3]    In regards to the contracts between utilities and the government for enrichment of uranium, we stated in Florida Power:

> It seems clear that if the government purchased natural uranium directly from a third party, enriched the uranium, and sold it to the customer utilities, the contracts would be for the disposal of personal property and would be covered by the CDA. It seems equally clear that if the government simply enriched each utility's uranium for a fee, it would be providing a service, not disposing of personal property.
>
> In light of the evidence that DOE used feed material from other customers, and sometimes its own feed material, to fulfill a particular enriched customer's order of enriched uranium, this case does not fall neatly into either the above categories, but it is closer to the latter. The nature of the contractual pricing scheme, in particular, persuades us that the transaction is properly characterized as a service rather than a sale.

307 F.3d at 1373.

the general purpose of the antidumping statute is not the same as the general purpose of the CDA, it is incorrect in asserting that this dissimilarity of purposes is sufficient to compel a different result in this case. A contract for services of the kind that we discuss here entails a certain set of obligations on the part of contracting parties that do not change with the statutory scheme. Thus, unless Congress specifically gave guidance in the statutory text that certain contracts normally considered service contracts should be considered contracts for the sale of goods in the antidumping context, the different overall purposes of the CDA and antidumping statute are insufficient to alter our analysis here. And nothing in the text of the antidumping statute or its legislative history evidences such a Congressional intent to re-characterize contracts like the SWU contracts at issue in this case for the purposes of antidumping investigations by Commerce.

The persuasive power of Florida Power might be mitigated if the government were capable of showing that the contract in that case differed in relevant part from the contracts in this case. No such showing has been made. In Florida Power, we held that an SWU contract was not a contract for "the procurement of property" under the CDA. 307 F.3d at 1373-74. Though we did say that SWU contracts do "not fall neatly" either into the category of contracts for services or the category of contracts for the sale of goods, we found that "the nature of the contractual pricing scheme . . . persuade[d] us that the [SWU] transaction is properly characterized as a service rather than a sale." Id. The pricing scheme in the Florida Power SWU contracts is the same as the pricing scheme in the contracts at issue in this case. In both cases, utilities bought separative work units from enrichers. In both cases, they delivered unenriched uranium and

monetary compensation to enrichers in return for enrichment services. In both cases, there were similar title and transfer provisions. And in both cases, the contracts explicitly contemplated the rendering of "enrichment services."

We therefore conclude that the SWU contracts at issue in this case were contracts for the provision of services and not for the sale of goods. Accordingly, we find that the LEU produced as a result of those contracts is not subject to the antidumping statute and hold that Commerce's contentions to the contrary are not in accordance with law.

### C. EdF, Eurodif and Countervailable Subsidies

In order to be subject to a countervailing duty (or subsidy) investigation, an arm of a foreign government must make a "financial contribution" to a manufacturer that can take one of four forms:

> (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,
>
> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,
>
> (iii) providing goods or services, other than general infrastructure, or
>
> (iv) purchasing goods.

19 U.S.C. § 1677(5)(D) (2000). A public entity can provide a subsidy if it provides goods or services to a manufacturer for less than adequate remuneration or if it buys goods from the manufacturer for more than adequate remuneration. 19 U.S.C. § 1677(5)(E). The statute does not contemplate the purchase of services for more than adequate remuneration to be a subsidy.

The government and USEC assert that EdF, a partially public French utility, entered into a uranium enrichment contract with Eurodif that paid Eurodif more than adequate remuneration. In their view, the contract was also for the sale of goods (instead of services) and thus covered by 19 U.S.C. § 1677(5)(E). In the alternative, they argue that the contract between EdF and Eurodif provided more than adequate remuneration to one step (enrichment) in the manufacture of a good (LEU in this case) and was thus covered by § 1677(5). As a result, the transaction between EdF and Eurodif was subject to a countervailing duty investigation.

The Court of International Trade rejected the government's principal theory but agreed with its alternative theory. The court found that "Commerce's distinction between manufacturing processes that lead to the production of subject merchandise and other services that do not produce tangible goods is consistent with the language and purpose of the countervailing duty statute." USEC II, 281 F. Supp. 2d at 1350. The court further elaborated that this theory was in keeping with the statutory language "because it preserves a real distinction between 'goods' and 'services.'" Id. We must disagree.

Section 1677(5) is clear as to what constitutes a subsidy—and the purchase of a service by a foreign public entity, however related to the manufacture of a good, is not contemplated in the statute as being a subsidy.[4] While the provision of services by a government entity to another entity for less than adequate compensation may be considered a subsidy, the plain language of § 1677(5) does not allow for the purchase

---

[4]    Section 1677(5)(B) defines a subsidy as including the case in which an authority "provides a financial contribution . . . to a person and a benefit is thereby conferred." Section 1677(5)(D), quoted supra, defines "financial contribution."

of services by a government entity from another entity to be considered a subsidy. Thus, to the extent that the government argues that Commerce is owed deference under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), we reject that argument because we find that the plain meaning of the statute is unambiguous.

Furthermore, § 1677(5)(D)(iii) clearly shows that Congress was aware of the distinction between contracts for services and contracts for goods. Aware of the distinction, Congress could have easily included the purchase of services by public entities in the statutory definition of a subsidy. Because it did not, we must assume that the omission was intentional. See Clay v. United States, 537 U.S. 522, 528 (2003) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we have recognized, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotations and citations omitted)).

While the Court of International Trade, the government and USEC are correct that the purpose of the subsidy statute is to defeat unfair competitive advantage, that purpose cannot exceed the metes and bounds of the subsidy statute as established by its text. See Negonsott v. Samuels, 507 U.S. 99, 105 (1993) ("[A court's] task is to give effect to the will of Congress, and where it has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982))).

Given that we have already concluded that the SWU contracts in this case were contracts for the provision of services and not for the sale of goods, we hold that 19

U.S.C. § 1677(5) is inapplicable in this case. Accordingly, Commerce's determination to the contrary is not in accordance with law.

## D. Commerce's Tolling Regulation and Its Determination of Export Price

Because our holdings regarding the previous three issues obviate the need for us to reach the issue of whether Commerce properly employed its tolling regulation in its determination of export price, we decline to do so.

## CONCLUSION

For the reasons stated above, we hold that:

(1) Commerce's determination that USEC's petition had sufficient industry support to trigger an antidumping and countervailing subsidy investigation was in accordance with law;

(2) Commerce's finding that the SWU contracts in this case were contracts for the sale of goods was neither supported by substantial evidence nor in accordance with law; and

(3) Commerce's application of 19 U.S.C. § 1677 to the SWU transaction between EdF and Eurodif was not in accordance with law.

Therefore, we affirm the Court of International Trade's decision regarding Commerce's industry support determination. We likewise affirm the court's finding that the SWU contracts in this case were contracts for services and not for goods or merchandise. We reverse the court's holding that EdF's SWU contract with Eurodif made the LEU produced by Eurodif subject to the countervailing subsidy statute.

AFFIRMED-IN-PART and REVERSED-IN-PART